UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL D. WORDEN,

    Petitioner,                                    Civil No. 04-CV-70701-DT
                                             HONORABLE PAUL D. BORMAN
v.                                                UNITED STATES DISTRICT JUDGE

KENNETH McKEE,

    Respondent,
_____/

**OPINION AND ORDER DENYING (1) THE PETITION FOR WRIT OF HABEAS CORPUS, (2) A CERTIFICATE OF APPEALABILITY, AND (3) LEAVE TO APPEAL IN FORMA PAUPERIS**

Michael D. Worden, ("petitioner"), presently confined at the Ojibway Correctional Facility in Marenisco, Michigan, seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his *pro se* application, petitioner challenges his conviction for conspiracy to commit assault with intent to do great bodily harm less than murder, M.C.L.A. 750.84; M.S.A. 279; M.C.L.A. 750.157a; M.S.A. 28.354(1); assault with intent to do great bodily harm less than murder, M.C.L.A. 750.84; M.S.A. 279; and second-degree murder, M.C.L.A. 750.317; M.S.A. 28.549. For the reasons stated below, petitioner's application for writ of habeas corpus is **DENIED.**

**I. BACKGROUND**

Petitioner was convicted of the above offenses following a jury trial in the Genesee County Circuit Court. Two of petitioner's co-defendants, Mark Gonzalez and Ryan

Kendrick, who were tried jointly tried with petitioner, but before separate juries, were convicted of first-degree premeditated murder, along with the conspiracy and assault with intent to do great bodily harm charges. Two other defendants, Ricky Beggs and Chris Crandell, testified against the other co-defendants as part of a plea agreement.

Petitioner and his co-defendants were convicted for beating Mark Harris, a homeless man, to death in Burton, Michigan. Although petitioner was fifteen years old at the time of the murder, he was tried as an adult.

Chris Crandell was originally charged with assault with intent to do great bodily harm, but was permitted to plead guilty to attempted felonious assault, with an agreement to testify. On the night in question, petitioner and Gonzalez asked the victim to buy beer for them. The victim went to the store and purchased the beer, before getting into a car with the men. The men drove the victim to a trailer behind a Dunkin' Donut shop and dropped him off. The other men started to get into Crandell's car to leave, but Gonzalez stated that he wanted to beat "the bum" (referring to the victim) up. Petitioner agreed to the idea. Gonzalez threw a piece of cement or stone toward the trailer where the victim had gone. The men then left to pick up Jennifer Jones.

Gonzalez told the others that he wanted to go back and beat up the victim. Crandell picked up Jennifer Jones and they went to Jeff Rathburn's house. Kendrick, Beggs, and Rathburn were there. Gonzalez and petitioner told Beggs, Kendrick, and Rathburn about how they wanted to go beat up the victim.

Crandell testified that Beggs, Gonzalez, Kendrick, petitioner, and Jones got into

his car and left to go beat up the victim. They drove to a car wash on Saginaw Street and parked behind it. The men got out of the car and each took a beer bottle from the trunk and went to the victim's trailer. Crandell stopped and stood about 40 yards from the trailer. Crandell could not see anything, but he could hear thuds, like someone being hit, yelling, and bottles being broken. Jennifer Jones likewise testified that she heard what sounded like an old man yelling. Crandell could hear more than one person yelling things such as "Yeah, Yeah. Yeah, Let's get him." Crandell then testified that the men came running back.

Crandell returned to the car first, followed by Beggs, Gonzalez, Kendrick, and petitioner. Gonzalez, Kendrick, and petitioner were acting "hyper" and Gonzalez had blood on his hands. Crandell testified that the other men were bragging and yelling about how they had beat up the victim, although he could not remember who said what. Much of Crandell's testimony was corroborated by Jennifer Jones's testimony.

Crandell and Jones testified that they all returned to Rathburn's house, before leaving again. Jeff Rathburn testified that when the men returned, Kendrick, Gonzalez, and petitioner went upstairs to wash their hands. Petitioner and Gonzalez were acting hyper, were jumping up and down, and were throwing punches in the air. Petitioner said that they had gone and beaten up Mark Harris and had hit him with bottles and sticks.

Misty Marie Montague had been present at Rathburn's house on the night in question. Petitioner and his co-defendants discussed going behind the Dunkin' Donut shop to have a man buy them beer. Petitioner told the others he was going to beat the

man up by smashing a beer bottle over his head if he did not buy them beer. Montague testified that when petitioner and the others returned to Rathburn's house, petitioner had a blood stain on his shirt. Montague also heard petitioner state that he had beat up the guy behind the Dunkin' Donut shop.

Gonzalez talked about returning to the victim's trailer to beat up the victim again. Crandell did not want to do this. When Crandell turned his vehicle in the opposite direction from the victim's trailer, petitioner, Gonzalez, Kendrick, and Beggs got out of the car. Crandell took Jones home before returning to the area near the car wash. Crandell walked up to a fence behind a McDonald's, where he could hear the co-defendants' voices by the victim's trailer. Crandell made various noises, with the hopes that it would scare off the co-defendants. Crandell was unable to stop the other co-defendants from assaulting the victim a second time. As he was leaving, he observed petitioner and Kendrick opening up the two big doors to the back of the victim's trailer.

The next day, petitioner came over to Crandell's house with Beggs and Kendrick. Petitioner said to Crandell, "You didn't see anything last night, right? You don't know anything about last night, right?"

David Crumb testified that he encountered Chris Crandell at about 3 o'clock in the morning on July 20, 1999, at a red light on the corner of Bristol and Saginaw Streets. Crandell told Crumb about the assault of the victim at the trailer. Crumb drove behind the Dunkin' Donut shop by the trailer. Crumb observed petitioner and the three other co-defendants come out of the trailer and walk to his truck. The men were acting hyper.

4

Kendrick told Crumb that he hit the victim in the head with a brick. Crumb could not remember what petitioner told him about his involvement in the assault, but petitioner stuck his hand in Crumb's truck and tried to "high-five" him. Crumb's testimony was corroborated by his passenger, Jamie Lee Rousseau.

Ricky Beggs, Jr. testified that he pled guilty to reduced charges of second-degree murder, conspiracy to commit great bodily harm, and assault with intent to do great bodily harm. Beggs corroborated much of Crandell's testimony. However, Beggs accompanied the men to the victim's trailer during the first assault. Gonzalez banged on the victim's door. When the victim opened the door, Gonzalez punched him. The victim fell, but got back up. Gonzalez hit the victim again in the face and then followed him into the trailer. When the victim grabbed Gonzalez' leg, petitioner grabbed Gonzalez' hand to help him out. Kendrick grabbed the victim's leg and was hitting it against the bottom and side of the trailer. Gonzalez, petitioner, Kendrick, and Beggs all threw their beer bottles at the victim. Beggs heard the bottles break. Kendrick threw a brick at the victim, hitting him in the head. During the assault, petitioner, Gonzalez, and Kendrick all punched the victim hard with their fists.

Beggs also testified about the men returning to the victim's trailer to assault him again. During the second assault, petitioner hit the victim's hands with a stick, while Kendrick used a big board to hit the victim in the chest and rib area. At one point, Gonzalez hit the victim in the head with a stick. Petitioner actually told Gonzalez to stop hitting the victim in the head. However, petitioner, Gonzalez, and Kendrick later took

5

turns hitting the victim about 10 to 15 times in the back, while he lay on the ground, with two to two and a half or three foot boards.  At some point, petitioner spat on the victim.  Kendrick stepped on the victim's chest and stomach area.  Petitioner used a piece of paper to pull down the victim's pants, before hitting him his genital area several times with a stick.

Detective Donald Elford testified that petitioner confessed to his involvement in the murder.  Petitioner's confession mirrored the testimony that the other persons gave about his involvement in the murder.

In addition to the live testimony, Glen Allen Hall, a Michigan state police DNA expert, testified that blood taken from a t-shirt matched petitioner's DNA profile, while other blood taken from the same t-shirt had the victim's DNA profile.

The autopsy revealed that the victim had sustained trauma to 85 percent of his body, including his head and face.  There were areas of bleeding in some areas of the brain.  The right upper chest was almost one entire large bruise.  There was an abrasion to the victim's groin and his penis was bruised.  There was bruising and hemorrhaging to the abdominal cavity.  Ribs on both sides of the victim's body were broken.

Petitioner's conviction was affirmed on appeal. *People v. Worden,* No. 230153 (Mich.Ct.App. February 11, 2003); *lv. den.* 469 Mich. 864; 666 N.W. 2d 74 (2003).  Petitioner now seeks the issuance of a writ of habeas corpus on the following grounds:

> I.  Did the trial court err reversibly in determining that defendant did not request the assistance of counsel before making a confession to police which was introduced in evidence against him?

6

II.  Did the trial court err reversibly by finding that defendant voluntarily, knowingly, and intelligently waived his rights to counsel and to remain silent prior to confessing?

## II.  STANDARD OF REVIEW

28 U.S.C. §2254(d) imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409.  A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

## III.  DISCUSSION

7

The Court will consolidate petitioner's two claims together for the purpose of judicial economy. In his first claim, petitioner contends that his right to counsel was violated when Detective Elford continued to question petitioner after he stated that his stepfather told him that he should have an attorney before making a statement. In his second claim, petitioner contends that he did not knowingly and intelligently waive his *Miranda* rights for a number of reasons.

Respondent contends that the petition should be denied, because petitioner's first claim was procedurally defaulted and without merit and because petitioner's second claim is without merit. Respondent further contends that even if the confession were erroneously admitted, any error was harmless, in light of the overwhelming evidence against petitioner.

Unless its jurisdiction is at stake, a federal district court on federal habeas review "may take up issues in whatever sequence seems best, given the nature of the parties' arguments and the interest in avoiding unnecessary constitutional decisions." *Aleman v. Sternes* 320 F. 3d 687, 691 (7th Cir. 2003). When confronted with several possible grounds for deciding a case, any of which would lead to same result, a federal court should choose the narrowest ground in order to avoid unnecessary adjudication of constitutional issues. *U.S. v. Allen* 406 F. 3d 940, 946 (8th Cir. 2005). A federal district court on habeas review of a state court conviction can directly perform a harmless error analysis of a habeas petitioner's claims without first reviewing the merits of the claims, when it is in the interest of judicial economy and brevity to do so. *See Porter v. Horn,*

276 F. Supp. 2d 278, 344 (E.D. Pa. 2003).  For the reasons that follow, this Court determines that admission of petitioner's confession into evidence was harmless error at best, thus, petitioner would not be entitled to the issuance of a writ of habeas corpus.

For purposes of determining whether federal habeas relief must be granted to a state prisoner on the ground of federal constitutional error, the appropriate harmless error standard to apply is whether the error had a substantial and injurious effect or influence in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *See also Robinson v. Stegall,* 157 F. Supp. 2d 802, 822 (E.D. Mich. 2001).  The *Brecht* harmless error standard applies even if a federal habeas court is the first court to review the case for harmless error, as is the case here. *Gilliam v. Mitchell*, 179 F. 3d 990, 995 (6th Cir. 1999); *Robinson,* 157 F. Supp. 2d at 822, n. 8.

On habeas review, a conviction may be reversed if the improper admission of a petitioner's statements, in violation of his or her right to counsel, had a substantial and injurious effect or influence in determining the jury's verdict. *See Alvarez v. Gomez*, 185 F. 3d 995, 998 (9th Cir. 1999).  In the present case, even if petitioner was interrogated in violation of *Edwards v. Arizona*, 451 U.S. 477 (1981), the admission of the statements that he made to Detective Elford did not result in actual prejudice to petitioner, because his statement was duplicative of other evidence that was introduced in this case. *See Kyger v. Carlton,* 146 F. 3d 374, 382-83 (6th Cir. 1998).  Similarly, the admission of evidence obtained from a suspect in violation of *Miranda* is considered harmful only if it has a substantial and injurious effect in determining the jury's verdict. *Id.* at p. 381-82.

9

Any possible error in admitting petitioner's confession into evidence was harmless, even if petitioner's waiver of his *Miranda* rights was involuntary, in light of the additional evidence against petitioner. *See Powell v. Bowersox*, 895 F. Supp. 1298, 1312 (E.D. Mo. 1995).

In the present case, there was overwhelming evidence of guilt against petitioner irrespective of his statement to the police. Two of petitioner's co-defendants testified in great detail about petitioner's involvement in both assaults upon the victim. Much of their testimony was corroborated by five other witnesses. Petitioner bragged about his involvement in the beatings to several of these witnesses. In addition, the results of the autopsy were consistent with Beggs' description of the second assault upon the victim. Petitioner's blood and the victim's blood were found on the same t-shirt. In light of the overwhelming evidence in this case, the admission of petitioner's confession into evidence was, at best, harmless error.

### IV. CONCLUSION

The Court will deny the petition for writ of habeas corpus. The Court will also deny a certificate of appealability to petitioner. In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473,

483-84 (2000). When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at 484. A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *Castro v. United States,* 310 F. 3d 900, 901 (6th Cir. 2002).

For the reasons stated in this opinion, the Court will deny petitioner a certificate of appealability because reasonable jurists would not find this Court's assessment of petitioner's claims to be debatable or wrong. *Johnson v. Smith,* 219 F. Supp. 2d 871, 885 (E.D. Mich. 2002). The Court will also deny petitioner leave to appeal *in forma pauperis,* because the appeal would be frivolous. *Allen v. Stovall,* 156 F. Supp. 2d 791, 798 (E.D. Mich. 2001).

## V. ORDER

Based upon the foregoing, IT IS ORDERED that the petition for a writ of habeas corpus is **DISMISSED WITH PREJUDICE.**

IT IS FURTHER ORDERED That a certificate of appealability is **DENIED.**

IT IS FURTHER ORDERED that petitioner will be **DENIED** leave to appeal *in forma pauperis.*

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: November 7, 2006

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on November 7, 2006.

                                        s/Denise Goodine
                                        Case Manager